2010 ME 71

**STATE of Maine**

v.

**Keith R. NADEAU.**

Supreme Judicial Court of Maine.

Argued: April 13, 2010.

Decided: July 29, 2010.

446

Michael A. Cunniff, Esq. (orally), McCloskey, Mina & Cunniff, LLC, Portland, ME, for Keith R. Nadeau.

Andrew S. Robinson, Asst. Dist. Atty. (orally), Franklin County District Attorney's Office, Farmington, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] Keith R. Nadeau appeals from a judgment of conviction of two counts of possession of sexually explicit material (Class D), 17–A M.R.S. § 284(1)(A) (2009), entered in the Superior Court (Franklin County, *Murphy, J.*) after his conditional guilty plea. Nadeau contends that the court erred in denying his motion to suppress evidence, asserting that (1) the warrantless searches and seizures of his personal computer and flash drive were unlawful and not justified by any exception to the warrant requirement of the Fourth Amendment to the U.S. Constitution; (2) once a search warrant was issued, the officers' failure to return the warrant and a written inventory within ten days violated M.R.Crim. P. 41(d); and (3) his oral and written statements were made before he received the requisite *Miranda* warnings and were involuntary. We affirm the judgment.

## I.  BACKGROUND

[¶ 2] Viewing the evidence in the light most favorable to the court's judgment, *State v. Bailey*, 2010 ME 15, ¶ 3, 989 A.2d 716, 718, the record supports the following facts.

[¶ 3] In December 2007, Nadeau was an undergraduate student at the University of Maine at Farmington. On December 5, the University's police department received a report from another student that, on December 4, Nadeau had shown child pornography to the student on Nadeau's personal computer in Nadeau's dorm room. University Police Officers John Irving and Dean Hart proceeded to Nadeau's dorm room. Officer Hart wore a hidden recording device, and both were armed and in uniform.

[¶ 4] Nadeau opened his door in response to the officers' knocking. The officers asked if they could enter the room, and Nadeau responded, "Yeah. Sure." The officers informed Nadeau that they had received a complaint that he was in possession of child pornography. Nadeau responded by asking the officers if he could shut his door, and they agreed. Nadeau then stated that his parents had taken him to court the previous year after child pornography was found on his home computer. Officer Irving then suggested that the images on Nadeau's computer might be "preexisting" and from that earlier case, to which Nadeau responded: "That's what I, I found it and then I haven't had a chance to delete 'em." The officers then request-

ed the pornographic images and Nadeau consented:

> [Nadeau]: I was going to delete 'em.
>
> PO Hart: Ah, we, we need to have that.
>
> PO Irving: Absolutely. Yeah.
>
> PO Hart: Alright?
>
> [Nadeau]: Yup. I I haven't, I was, I found them on my laptop key and I need to delete them and I haven't had a chance.

As this colloquy was occurring, Nadeau turned toward his desk, took the flash drive out of a drawer, and handed it to Officer Hart.

[¶ 5] Nadeau became extremely emotional during the interview, both crying at times and stating that he did not want to go to jail. The officers sought to calm him by explaining that he was not going to jail at that time, and they asked him whether he wanted to continue the interview at their office where the setting would be more private. He declined. Next, the officers asked Nadeau whether he was going to hurt himself, and he promised that he would not. Nadeau did express concern, however, that his parents were "gonna kill" him. Again, the officers told Nadeau that he could accompany them to their office, but, once again, he declined. Despite his emotional state, Nadeau's answers were coherent and responsive to the questions asked.

[¶ 6] The officers asked Nadeau if he wanted to write an explanation of the circumstances that led to his possession of the images, and he agreed. When Officer Hart informed Nadeau that he did not have a *Miranda* card with him but that anything he said could be used against him, Nadeau interrupted and stated, "I've already been through all this." Officer Hart did not complete the rest of the *Miranda* warnings. Officer Hart then re-

plied, "But the more cooperative you are, the better things are for you." This first segment of the interview lasted approximately twelve minutes.

[¶ 7] While Nadeau was writing his statement, Officer Irving left the room to contact Edward Blais, the chief of the University's police department. After speaking with Chief Blais by phone, Officer Irving met briefly with Officer Hart outside the dorm room. When they reentered, Officer Hart told Nadeau that, after speaking with Chief Blais, they were "going to have to take [the] computer too." Although Officer Hart explained that they would try to return the computer to Nadeau later that night, Nadeau expressed concerns because his computer contained his schoolwork and e-mails to his professors. At no time did Nadeau give the officers explicit verbal or written consent to search or seize his computer. This second segment of the interview, beginning when the officers reentered the dorm room to when they left in possession of Nadeau's computer, lasted less than a minute.

[¶ 8] Later that evening, Officer Hart returned to Nadeau's room to obtain the power cord for Nadeau's computer. When Officer Hart arrived, Nadeau and his mother, Kimberly Nadeau, were both present and Officer Hart spoke to Kimberly. She refused to give Officer Hart the power cord and asked him to call their attorney, which he did. The attorney did not request the return of the computer or flash drive during the phone conversation. Chief Blais delivered the flash drive and computer to the Maine State Police Computer Crimes Unit (the "Crime Lab") in Vassalboro.

[¶ 9] Three days later, on December 7, Nadeau and Kimberly went to speak with Chief Blais. Kimberly requested that Chief Blais return Nadeau's computer, but

the Chief declined, explaining that it had already been sent to the Crime Lab. Chief Blais also spoke by phone with Nadeau's attorney in the succeeding days, but the attorney never requested the return of the computer equipment.

■ [¶ 10] When the Crime Lab received the equipment, it was informed by Chief Blais that Nadeau had consented to the search and seizure of both the flash drive and the computer. Sergeant Glen Lang, who was assigned to the Crime Lab, informed Chief Blais that a preview search [1] of the evidence should be conducted and that, based on the results of the preview search, they would then determine whether they would need a search warrant "to go further and do a forensic exam of the equipment."

[¶ 11] The preview search revealed that the computer contained child pornography. Working with the assistance of Sergeant Lang, Assistant District Attorney Jim Andrews, and Assistant Attorney General Carlos Diaz, Chief Blais sought and obtained a search warrant on December 11, 2007. The warrant required that it be executed and an inventory be prepared and returned to the court within ten days of its issuance. On the same day, Chief Blais delivered the warrant to the Crime Lab where it was filed with the other pending cases. The Crime Lab had a significant backlog of requests for the forensic examination of computers at that time.

[¶ 12] The Crime Lab completed its examination of the computer in July 2008, approximately seven months after the search warrant was obtained. The State never sought an extension of the ten-day deadline to return the warrant. When Chief Blais received the report detailing the results of the forensic exam from the Crime Lab, he delivered it to the Franklin County District Attorney's Office. Chief Blais explained that, because the case was different from others that he had previously worked on, he "totally didn't think about the inventory that needed to go back to the Court." An inventory was never prepared or filed with the court.

[¶ 13] Nadeau was indicted for possession of sexually explicit material (Class C), 17–A M.R.S. § 284(1)(C) (2009), and two counts of possession of sexually explicit material (Class D), 17–A M.R.S. § 284(1)(A). In denying Nadeau's motions to suppress evidence and his statements to the police, the Superior Court issued a detailed opinion setting forth its findings and conclusions. In summary, the court determined that (1) Nadeau was not in custody when he made statements to the University Police and that his statements were voluntary; (2) Nadeau consented to the seizure and search of the flash drive and that his consent was never revoked; [2]

---

1. A "preview search" is a quick search that scans a computer's data for contraband or relevant evidence. *See United States v. Barefoot*, No. 07–405, 2008 WL 3166947, at *3, 2008 U.S. Dist. LEXIS 59797, at *6–7 (W.D.Pa. Aug. 5, 2008) (a preview search "involve[s] securing the computer's hard drive and searching for files containing still images and video images"); *New Jersey v. Finesmith*, 406 N.J.Super. 510, 968 A.2d 715, 718 (App. Div.2009) (a forensic "preview enables the police to conduct a cursory search that will reveal any media on that computer such as video files or pictures") (quotation marks

omitted). It allows an examiner to view digital evidence "in a read-only mode, without actually acquiring it." Sharon D. Nelson & John W. Simek, *Preparing for Electronic Discovery*, GPSolo, Dec. 2005, at 42, 45. Thus, the search is not permanent and does not capture and store images and data, but rather allows an examiner to develop a report based on what the examiner observed at a particular moment in time. *See id.*

2. In finding that Nadeau had consented to the search of the flash drive, the court reasoned that

(3) Nadeau did not consent to the seizure of his computer, but that the exclusionary rule did not apply to this evidence because the computer's discovery was inevitable; (4) the State "completely failed to timely file the return" of the warrant, but that the filing was ministerial and did not justify suppression of the evidence for noncompliance; and (5) although the search warrant had expired before the July search was completed, the good faith exception applied because the Crime Lab believed that there was consent to search the equipment and it had a valid warrant based on probable cause.

[¶ 14]  After the denial of his motion to suppress, Nadeau entered a conditional guilty plea to the two counts of possession of sexually explicit material (Class D), 17–A M.R.S. § 284(1)(A), in contemplation of the State's dismissal of the felony possession of sexually explicit material (Class C), 17–A M.R.S. § 284(1)(C).  For the first charge of possession of sexually explicit material, Nadeau was sentenced to 270 days in jail and ordered to register as a sex offender.  Nadeau was also sentenced to 270 days in jail for the second charge— to be served consecutively with the first charge—but the confinement was suspended.  He was also placed on probation for one year.

## II.  DISCUSSION

■  [¶ 15]  This appeal presents a variety of legal issues stemming from the search and seizure of Nadeau's flash drive and computer, and the inculpatory statements he made to the police.  When reviewing the denial of a motion to suppress, we review the trial court's factual findings

for clear error and its legal conclusions de novo.  *State v. Bilynsky,* 2007 ME 107, ¶ 16, 932 A.2d 1169, 1173.  Because our analysis of the issues presented is lengthy, we offer the following synopsis of our conclusions:

A.  The warrantless search and seizure of Nadeau's flash drive were lawful due to Nadeau's consent.

B.  The initial warrantless seizure of Nadeau's computer violated the Fourth Amendment because it was not authorized by Nadeau's consent.

C.  The warrantless preview search of Nadeau's computer was not justified by exigent circumstances and, contrary to the State's contention, was neither required by nor consistent with the decision of the First Circuit Court of Appeals in *United States v. Brunette,* 256 F.3d 14 (1st Cir.2001).

D.  Because Nadeau's computer would have been inevitably discovered by the authorities through lawful means, the initial warrantless seizure and the unlawful preview search do not require the remedy of suppression.

E.  The State's failure to complete its forensic examination of the computer within the ten-day period established by the warrant and M.R.Crim. P. 41(d) does not justify application of the exclusionary rule.

F.  The State's failure to file an inventory with the court within the ten-day period established by M.R.Crim. P. 41(d) does not justify application of the exclusionary rule.

---

Any reasonable person in the defendant's situation would be aware that the officers were looking not only to seize the equipment but also to search it.  It is difficult to draw a contrary conclusion based upon the nature of computer crimes, the evidence of which is uncovered by searching the equipment and not through a simple exterior viewing.

G. Nadeau's statements to the police were not made in violation of the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and were voluntary.

A. The Warrantless Search and Seizure of Nadeau's Flash Drive Were Lawful Due to Nadeau's Consent

[¶ 16] Nadeau argues for the suppression of the flash drive and the data stored on the flash drive because he never consented to its seizure by the police. He contends that neither his words nor his gestures constituted an objective manifestation of consent and that he turned the flash drive over to the police only in response to their persistent demands.

1. Consent

[¶ 17] A search conducted pursuant to consent is one of the well-settled and "established exceptions to the requirements of both a warrant and probable cause." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Consent must be given freely and voluntarily. *State v. Seamen's Club*, 1997 ME 70, ¶ 7, 691 A.2d 1248, 1251. The State has the burden of proving by a preponderance of the evidence "that an objective manifestation of consent was given by word or gesture." *Id.*

[¶ 18] A court's factual findings addressing the existence of consent are reviewed for clear error. *See, e.g., Bailey*, 2010 ME 15, ¶ 19, 989 A.2d at 722. The ultimate question of whether the facts, as found, establish that an individual consented to the ensuing search and seizure is a distinctly legal question that we will review de novo. This approach is consistent with the bifurcated standard of review that the United States Supreme Court and this Court apply to a variety of analogous issues with constitutional import. *See Miller v. Fenton*, 474 U.S. 104, 112, 115–17, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (applying clear error standard of review to factual findings and de novo review for conclusions of law to determine voluntariness); *see also State v. Dion*, 2007 ME 87, ¶ 22, 928 A.2d 746, 750 ("We [re]view a decision on whether a person was in custody as a mixed question of fact and law.").[3] We treat consent as a mixed question of law and fact because the ultimate issue of whether consent was given and, if given, the scope of that consent,[4] has a "uniquely

---

**3.** *See also State v. Tuplin*, 2006 ME 83, ¶ 13, 901 A.2d 792, 796 (applying bifurcated standard of review to the issue of whether a defendant voluntarily waived his right to testify); *State v. Watson*, 2006 ME 80, ¶ 31, 900 A.2d 702, 713 (reviewing waiver of counsel as a mixed question of fact and law); *State v. Lockhart*, 2003 ME 108, ¶ 21, 830 A.2d 433, 442 (reviewing waiver of *Miranda* rights as a mixed question of fact and law); *State v. Coombs*, 1998 ME 1, ¶ 8, 704 A.2d 387, 390 (stating that the factual findings of whether a confession is voluntary "are reviewed deferentially, [but that] the application of legal principles to those findings is reviewed independently").

**4.** We have not previously identified a fixed standard of review for scope of consent issues. *See State v. Bailey*, 2010 ME 15, ¶ 27, 989 A.2d 716, 724 ("[W]e have not yet determined the appropriate standard of review to be applied to a trial court's determination of [the scope of consent] issue."). The United States Supreme Court has not addressed the issue of whether the scope of consent is a factual determination reviewed for clear error or a legal conclusion reviewed de novo. *See Florida v. Jimeno*, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The federal circuit courts have not adopted a uniform standard of review for this issue. *Compare United States v. Stewart*, 93 F.3d 189, 192 (5th Cir.1996) ("Objective reasonableness is a question of law reviewed *de novo*."), *with United States v. Cruz–Castro*, No. 09–10243, 2010 WL 1735521, at \*2, 2010 U.S.App. LEX-

legal dimension" arising from core constitutional values. *See State v. Tuplin*, 2006 ME 83, ¶ 13, 901 A.2d 792, 796 (quotation marks omitted).

[¶ 19] The recorded interview between the University Police and Nadeau indicates that he verbally consented to the seizure of the flash drive. After Officer Hart stated, "Ah, we, we need to have that," Officer Irving stated, "Absolutely Yeah." Officer Hart then asked, "Alright?" to which Nadeau responded, "Yup." Moreover, the officers testified that Nadeau, upon being confronted about possessing child pornography, voluntarily moved towards his desk to retrieve the flash drive before he gave it to the police. Thus, Nadeau's verbal consent was consistent with his physical actions. These findings are sufficient to support the ultimate conclusion that Nadeau consented to the seizure of the flash drive by the police. The court did not commit clear error in its factual findings, and we discern no error in the court's ultimate conclusion that Nadeau consented to the search and seizure of the flash drive.

### 2. Scope of Consent

■ [¶ 20] Nadeau asserts that even if he is found to have consented to the seizure of the flash drive, his consent cannot be construed as having extended beyond the initial impoundment of the flash drive by the police. Thus, he argues that even if we conclude that the seizure of the flash

drive was lawful, the ensuing warrantless search of the digital information contained in the flash drive was unlawful because the search was conducted without a warrant and in the absence of any exception to the warrant requirement. Nadeau also relies on our recent decision in *Bailey*, 2010 ME 15, 989 A.2d 716, for the proposition that the court erred in this case because it relied on subjective factors to determine the scope of his consent.

[¶ 21] In *Bailey*, a police officer was investigating a lead regarding the dissemination of child pornography through a network program connected to the Internet. 2010 ME 15, ¶ 4, 989 A.2d at 718–19. The officer appeared at the defendant's home and asked the defendant for permission to examine the defendant's computer. *Id.* ¶ 7, 989 A.2d at 719. The reason given by the officer for the search was to determine whether others had improperly accessed the computer over the Internet. *Id.* Having been provided access to the computer, the officer "ran a general search for *all* of the video files on [the defendant's] computer." *Id.* ¶ 28, 989 A.2d at 725. We concluded that the court erred in considering subjective factors when determining the scope of the defendant's consent because such factors are inconsistent with the standard of objective reasonableness by which a person's manifestation of consent is measured. *Id.* Applying the objective reasonableness standard, we determined that the officer's search exceeded the scope of

---

IS 9023, at *5 (9th Cir. Apr. 30, 2010) ("We review for clear error whether a search fell within the scope of consent."), *United States v. Jackson*, 598 F.3d 340, 348 (7th Cir.2010) ("[W]hether the search remained within the boundaries of the consent is a question of fact . . . ." (quotation marks omitted)), *United States v. Canipe*, 569 F.3d 597, 604 (6th Cir. 2009) (applying clear error review to scope of consent determinations), *United States v. Pikyavit*, 527 F.3d 1126, 1129, 1135 (10th Cir. 2008) (same), *and United States v. Coffman*,

148 F.3d 952, 953 (8th Cir.1998) (same); *see also United States v. Jones*, 523 F.3d 31, 39 (1st Cir.2008) ("[W]e state no view on whether the scope of a given instance of consent is reviewed *de novo* or merely for clear error . . . ."). We discern no reason to review a court's determination of the scope of consent any differently than we review the question of consent itself. Therefore, a court's factual findings concerning the scope of consent for a search are reviewed for clear error, but its legal conclusion is reviewed de novo.

the defendant's consent because the "search was not consistent with [its] stated purpose."[5] *Id.*

[¶ 22] Here, the court's conclusion that Nadeau consented to the search of the flash drive was based in part on subjective factors. Specifically, the court cited both Nadeau's intelligence and his prior dealings with law enforcement in reaching its conclusion that his consent extended to the search of the flash drive. Nevertheless, the court's other factual findings, independent of these subjective considerations, provide ample support for its conclusion that the scope of Nadeau's consent included consent to access the digital information stored on the flash drive. At the outset of the interview with Nadeau, the officers explicitly informed Nadeau that they were investigating a complaint that he possessed child pornography. In response, Nadeau acknowledged that he was in possession of child pornography stored on his flash drive. The police then explained that they would need to take the flash drive, and Nadeau handed it to them.

[¶ 23] Within the context of the specific encounter between the officers and Nadeau, Nadeau's words and gestures communicated his implicit consent to the search of the digital information stored on the flash drive that he handed to the officers. *See United States v. Vongxay,* 594 F.3d 1111, 1113, 1120 (9th Cir.2010) (holding that the defendant gave implied consent to a search of his person by placing his hands on his head in response to the officer's request to search him).[6] The police were abundantly clear that the reason for and object of their investigation was child pornography. The object of their search was not limited to the flash drive itself, but plainly extended to any child pornography stored in the drive's digital memory. Moreover, when Nadeau handed the flash drive to the officers, he expressed no limitations on what they might do with it. Viewed objectively, a person in Nadeau's situation would have reasonably understood that the act of voluntarily handing the flash drive to the police was tantamount to handing over the child pornography itself. *See Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (determining that under the circumstances presented, "it was objectively reasonable for the police to conclude that the general consent to

---

**5.** In the analogous setting of motor vehicle searches, we held that a defendant's consent to a search of his vehicle did not extend to closed containers within it. *State v. Sargent,* 2009 ME 125, ¶ 1, 984 A.2d 831, 832. In *Sargent,* a police deputy asked a defendant who had been stopped at a vehicle checkpoint for a seatbelt violation for permission to search the defendant's vehicle. *Id.* ¶¶ 2, 3, 984 A.2d at 832–33. The deputy found and searched a shaving-kit style bag without additional consent and found pills that appeared to be methamphetamines. *Id.* ¶ 5, 984 A.2d at 833. In concluding that a reasonable person would not have believed that his or her consent extended to containers, we focused on the nature of the vehicle stop and that the defendant was not informed of the object of the search. *Id.* ¶ 14, 984 A.2d at 834–35.

**6.** *See also United States v. Walls,* 225 F.3d 858, 862–63 (7th Cir.2000) (finding implied consent to entry of house by police when defendant opened the door and stepped back to provide room for the police to enter); *United States v. Patten,* 183 F.3d 1190, 1194–95 (10th Cir.1999) (holding that the defendant gave implied consent to search his suitcase when he silently and without objection unzipped his suitcase after an officer asked, "Well, do you think we could take a look at your suitcase there? I don't want to necessarily look in it." (quotation marks omitted)); *United States v. Gordon,* 173 F.3d 761, 765–66 (10th Cir.1999) (stating that defendant's act of removing a key from his pocket and handing it to the police in response to the police officers' request to open the bag constituted implied consent).

search respondents' car included consent to search containers within that car").

### 3. Withdrawal of Consent

■ [¶ 24] Having concluded that Nadeau consented to the seizure and search of the flash drive, we next consider Nadeau's assertion that he subsequently withdrew his consent. Nadeau contends that his mother's testimony that she requested the return of the device contradicts the court's finding that there was no evidence that he withdrew his consent to the seizure of the flash drive. He also contends that the court erred in concluding that a parent cannot assert constitutional rights for his or her adult children.

■ [¶ 25] Nadeau's argument that he withdrew his consent to the seizure and search of the flash drive is unpersuasive. "[T]he law generally requires that the withdrawal of consent amount to an unequivocal act or statement of withdrawal." (*United States v. Cadieux*, 324 F.Supp.2d 168, 170 (D.Me.2004) (quotation marks omitted)); *see also United States v. Sanders*, 424 F.3d 768, 774 (8th Cir.2005) ("Withdrawal of consent need not be effectuated through particular magic words, but an intent to withdraw consent must be made [known] by unequivocal act or statement." (quotation marks omitted)).

■ [¶ 26] There was no evidence that Nadeau personally expressed, directly or otherwise, a desire to withdraw his consent to the search and seizure of the flash drive. In addition, the court was not compelled to accept the mother's testimony that she was acting as her son's authorized agent when she requested the return of the computer and the flash drive from Chief Blais. Although a college student, Nadeau was an adult at the time of these events. There is no presumption at law that the parent of an adult child is acting as the child's authorized agent in matters

affecting the child, nor was the court required to find the same as a matter of fact based solely on the mother's claim. Based on the evidence before it, the court was not required to conclude that there was an unequivocal withdrawal of consent.

### B. The Initial Warrantless Seizure of Nadeau's Computer Was Not Authorized by Nadeau's Consent and Violated the Fourth Amendment

■ [¶ 27] The court found that Nadeau did not consent to the seizure of his computer. The State, however, argues that the court erred in ruling that the police took Nadeau's computer without his consent and that this error should be corrected if we vacate the court's decision.

[¶ 28] The court's finding that Nadeau did not consent to the seizure of his computer is supported by evidence in the record. *See Bailey*, 2010 ME 15, ¶ 19, 989 A.2d at 722. The transcript from the officers' interview with Nadeau demonstrates that the officers explicitly invoked Chief Blais's authority when explaining to Nadeau why they needed to seize his computer. Nadeau expressed reservations about the seizure of his computer because he needed his computer to complete school assignments. Moreover, Nadeau did not spontaneously hand over the computer to the officers as he did with the flash drive. The court's legal conclusion that Nadeau neither consented to the seizure of his computer nor to any of the searches of the computer that followed was not erroneous.

### C. The Warrantless "Preview Search" of the Computer Was Supported Neither by Exigent Circumstances Nor the Holding of *United States v. Brunette*

■ [¶ 29] The search warrant issued December 11, 2007, was based in part on information obtained from the warrant-

less preview search of the computer conducted at the Crime Lab several days after the computer was taken from Nadeau. Because the computer was already in the State's possession, there were no exigent circumstances that would excuse the police from adhering to the Fourth Amendment's warrant requirement. The State contends, however, that the decision of the First Circuit Court of Appeals in *United States v. Brunette*, 256 F.3d 14, both authorized and required the State to conduct a preview search of the computer as a necessary step to obtain a search warrant. We disagree.

[¶ 30] In *Brunette,* a consumer watchdog group alerted an Internet service provider that alleged child pornography had been posted on an Internet site. 256 F.3d at 15. The Internet service provider discovered that the defendant was the source of the posting, and it copied thirty-three photographic images onto a disk that it forwarded to the U.S. Customs Service. *Id.* at 15–16. A Customs agent viewed the images and applied for a warrant to search the defendant's home. *Id.* at 16. The agent neither appended any of the allegedly pornographic images to the warrant application nor described them in his affidavit. *Id.* The affidavit only offered the agent's conclusion that the images constituted child pornography pursuant to a statute. *Id.* A search warrant was issued, and the defendant's computers were seized. *Id.*

[¶ 31] The trial court denied the defendant's motion to suppress the images obtained from his computers. *Id.* On appeal, the First Circuit concluded that the trial court erred in denying the defendant's motion to suppress because the judge had no independent basis for determining whether the images were pornographic:

> In sum, there having been no basis for issuing the warrant other than concluso-

ry statutory language, the magistrate judge should have viewed the images and the district court should not have excused his failure to do so. It was error to issue the warrant absent an independent review of the images, or at least some assessment based on a reasonably specific description. Ordinarily, a magistrate judge must view an image in order to determine whether it depicts the lascivious exhibition of a child's genitals.

*Id.* at 19.

[¶ 32] *Brunette,* therefore, stands for the proposition that to make a probable cause determination, the judicial officer must "either ... look at the allegedly pornographic images, or at least [make] an assessment based on a detailed, factual description of them." *Id.* at 18. The *Brunette* opinion further emphasized that even where the affidavit established that the agent was experienced in determining whether certain images met the statutory definition of child pornography, probable cause "must be assessed by a judicial officer, not an investigating agent." *Id.*

[¶ 33] The State asserts that *Brunette,* as applied to this case, required that it "provide samples of the images from the electronic devices" when it applied for the search warrant because the computer and the pornographic materials stored in it were in Chief Blais's possession at the time he prepared his affidavit. In *Brunette,* however, the police lawfully possessed the pornographic images, but failed to provide either copies of the images or a detailed description of them in the affidavit submitted in support of the search warrant application so that a judicial officer could make an independent determination of whether the images were indeed pornographic.

[¶ 34] Unlike *Brunette,* in this case the police unlawfully possessed the computer and had not accessed the images on the computer prior to the preview search. Regardless of its limited scope and purpose, the preview search was still a search. Further, it was performed without a warrant and in the absence of exigent circumstances or some other exception to the warrant requirement. The Fourth Amendment does not sanction the State's circular logic that an otherwise unconstitutional warrantless search becomes constitutional if it is undertaken by authorities to develop evidence of probable cause for the purpose of securing a search warrant.

[¶ 35] The warrantless preview search and seizure of digital information from Nadeau's computer constituted a violation of the Fourth Amendment.

D. The Initial Warrantless Seizure of the Computer and the Unlawful Preview Search Do Not Require Suppression Because of the Inevitable Discovery Exception

[¶ 36] The court determined that Nadeau had not consented to the seizure of the computer, but concluded that the remedy of suppression of the computer and its digital data as evidence was not warranted based on the inevitable discovery exception. Under the exception, the State bears the burden of establishing by a preponderance of the evidence, *see State v. Johnson,* 2009 ME 6, ¶ 47, 962 A.2d 973, 986, that "evidence found because of a Fourth Amendment violation would inevitably have been discovered lawfully." *State v. Storer,* 583 A.2d 1016, 1019–20 (Me.1990) (quotation marks omitted). "The prosecution may not rely on speculation but rather must meet this burden of proof based on 'demonstrated historical facts capable of ready verification or impeachment.'" *United States v. Ford,* 22

F.3d 374, 377 (1st Cir.1994) (quoting *Nix v. Williams,* 467 U.S. 431, 444 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). Nadeau contends that the inevitable discovery exception does not apply and that the officers' unconstitutional conduct warranted the application of the exclusionary rule.

[¶ 37] Evidence obtained from an unlawful search or seizure in violation of the Fourth Amendment is often excluded from admission in evidence at trial unless a particular exception applies. *See, e.g., Wong Sun v. United States,* 371 U.S. 471, 484–85, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *see also State v. May,* 608 A.2d 772, 776 (Me.1992). The inevitable discovery doctrine is one such exception to the application of the exclusionary remedy. *State v. St. Yves,* 2000 ME 97, ¶ 18, 751 A.2d 1018, 1023.

[¶ 38] We have previously stated that courts are to consider two elements when determining whether evidence would have been inevitably and lawfully discovered: "(1) the evidence could ... have been gained lawfully from information that is truly independent from the warrantless search, and (2) the evidence inevitably would have been discovered by such lawful means." *State v. Cormier,* 2007 ME 112, ¶ 17, 928 A.2d 753, 758. This test is based on a three-part test developed by the First Circuit in *United States v. Silvestri,* 787 F.2d 736, 744 (1st Cir.1986). In addition to these two elements, the First Circuit's test applies a third element, which we adopt today: the application of the inevitable discovery exception neither provides an incentive for police misconduct nor significantly weakens fourth amendment protections. *Id.; see also United States v. Scott,* 270 F.3d 30, 42 (1st Cir.2001); *United States v. Almeida,* 434 F.3d 25, 28 (1st Cir.2006); *State v. Rabon,* 2007 ME 113, ¶ 77 n. 15, 930 A.2d 268, 295 (Saufley, C.J., dissenting) ("A third aspect of the inevit-

able discovery exception has been identified by the First Circuit, which I conclude is embedded in the first two *Storer* elements."). This three-part test properly focuses the inquiry "on the questions of independence and inevitability" and provides the "flexib[ility] ... to handle the many different fact patterns which will be presented." [7] *Silvestri,* 787 F.2d at 746. In addition, the *Silvestri* test accounts for "whether the application of the inevitable discovery rule in any particular case before the court would encourage police misconduct or reduce the protections offered by the Fourth Amendment." *Rabon,* 2007 ME 113, ¶ 77 n. 15, 930 A.2d at 295 (Saufley, C.J., dissenting).

[¶ 39] Applying the three-part test to the factual circumstances of this case, we conclude that the inevitable discovery exception applies to the seizure of the computer and that suppression of the evidence is not warranted.

1. The Evidence Could Have Been Gained Lawfully from Information That Was Truly Independent from the Warrantless Search.

[¶ 40] The legal means by which the State could have lawfully obtained Nadeau's computer were truly independent of the means actually employed. *Compare Storer,* 583 A.2d at 1019–20 (stating that inevitable discovery applied because police had independent legal means to discover a bag containing drugs), *and Ford,* 22 F.3d at 378 (concluding that police had indepen-dent probable cause to search the defendant's home), *with United States v. Holmes,* 183 F.Supp.2d 108, 111 (D.Me. 2002) (holding that inevitable discovery was inapplicable because the government asserted "no independent and legal means by which [certain evidence] would have [been] inevitably discovered"). First, prior to the unlawful seizure of the computer, the police had received a detailed report from a student that Nadeau had shown the student child pornography on Nadeau's computer, in Nadeau's dorm room, the day before. The reliability of the student's information was established by Nadeau's statements to the officers and the officers' observation of Nadeau's possession of the computer and flash drive described by the student. Second, the police had audio-recorded and written admissions from Nadeau that he had child pornography on a flash drive that he used with his computer. Third, the police were in lawful possession of the flash drive, which did in fact contain child pornography. This evidence was itself sufficient to establish probable cause for the issuance of a search warrant for Nadeau's computer. *See Ford,* 22 F.3d at 378 ("It is inevitable that the existence of probable cause would find fruition in the issuance of a search warrant."); *see also United States v. Jadlowe,* 534 F.Supp.2d 217, 223 (D.Mass.2008) (holding that a warrant would have been sought because "[t]oo much evidence had been gathered and too much corroborating conduct on the part of the defendants had been observed for agents to simply take the chance that

---

7. The decision by the First Circuit Court of Appeals in *United States v. Silvestri* distinguished between factual situations involving "warrantless searches that are never followed by a warrant and warrantless searches that are followed by a warranted search." 787 F.2d 736, 744 (1st Cir.1986). The danger in applying the inevitable discovery exception in the former situation is that it bypasses the Fourth Amendment warrant requirement if the government can show by a preponderance of the evidence that the exception should apply. *Id.* at 744–45. In the latter situation, the "stakes are somewhat different" because "[t]he fact that a warrant has been obtained removes speculation as to whether a magistrate would in fact have issued a warrant on the facts and also ensures ... that the fourth amendment has not been totally circumvented." *Id.* at 745.

what was delivered ... was some innocent commodity").

2. The Evidence Inevitably Would Have Been Discovered by Lawful Means

[¶ 41] We need not speculate as to whether the police would have ultimately sought and obtained a search warrant because the police sought a search warrant within days of coming into possession of the computer. Even though they mistakenly believed Nadeau had consented to the seizure of his computer, they viewed a warrant as a necessary predicate to the forensic examination of the computer in recognition that a person's consent can be withdrawn. Moreover, the affidavit in support of the warrant application described with particularity the evidence on the computer that was sought. *See State v. Allard*, 674 A.2d 921, 923 (Me.1996) (stating that "general warrants are constitutionally prohibited" because the Constitutions of the United States and Maine "require that a search warrant describe with particularity the place or person subject to the search" (quotation marks omitted)). The particularity of the warrant application served to protect Nadeau's legitimate privacy interests in the lawful electronic information also stored in the computer.[8]

[¶ 42] The fact that Chief Blais's search warrant affidavit contained information derived from the illegal seizure and preview search of the computer does not preclude the application of the inevitable discovery exception under these circumstances. Evidence seized during the execution of a search warrant, which is based on information acquired by unconstitutional means, need not be excluded if (1) the information that was illegally obtained and used to support the issuance of a warrant is excised from the affidavit, and (2) we determine that "the judge or magistrate would have had probable cause to issue the warrant relying solely on the remaining information." *Rabon*, 2007 ME 113, ¶ 17, 930 A.2d at 275 (quotation marks omitted). Here, although Chief Blais's warrant affidavit contains information from the unconstitutional preview search on December 7, 2007, once excised, the redacted affidavit contains sufficient probable cause for the issuance of the warrant.

[¶ 43] In this case, there is little room for doubt that if the officers had only secured Nadeau's dorm room with the computer inside and sought a search warrant—as should have happened—they would have successfully obtained the warrant. That warrant would have led to the

---

8. The search warrant specifically described the computer and flash drive that were to be seized and authorized "the making of a duplicate or 'image' of any computer or electronic data storage device." The search warrant described the evidence to be seized on these devices as follows:
   1. Visual images depicting persons under the age of 18 engaged in sexually explicit conduct, as defined in 17–A M.R.S.A. § 281(4).
   2. Computer records or data that are evidence of the intentional or knowing manufacture, possession, or dissemination of sexually explicit materials, including but not limited to records of Internet use (such as Internet browser history, search engine history, temporary Internet files), electronic communications (such as email and email attachments, chat room communications, writings created generated on word processing software, notepads, etc.), stored data files and folders, graphic visual images (such as photographs, movie clips and scanned images), personal calendars or diaries, and any other electronic data that demonstrates the identity of the person(s) who exercised dominion or control over the computer or its contents.

inevitable discovery of the child pornography on Nadeau's computer.

3. The Application of the Inevitable Discovery Exception Neither Provides an Incentive for Police Misconduct Nor Significantly Weakens Fourth Amendment Protections

[¶ 44] Applying the inevitable discovery exception under the circumstances presented does not create an incentive for police misconduct. There is no indication that the officers did not believe that Nadeau had consented to the seizure of his computer, as he had with respect to his flash drive. Further, by ultimately seeking a search warrant for the computer, the authorities demonstrated an absence of excessive overreaching and an intention to comply with the fundamental protections of the Fourth Amendment. *Compare Jadlowe*, 534 F.Supp.2d at 224 ("There was no egregious or gratuitously excessive conduct on the part of the agents ... [nor] was [there] rummaging, prying, or superfluous detention of any occupants ...."), *with United States v. Rullo*, 748 F.Supp. 36, 45 (D.Mass.1990) (holding that the inevitable discovery exception did not apply where police used excessive physical force to compel a suspect to disclose the location of a gun and gave improper testimony at the suppression hearing). Furthermore, the decision to conduct a warrantless preview search of the computer was based on the erroneous but good faith belief that the same was required by *Brunette*. In short, there is no indication in the record that the preview search was intended to subvert the Fourth Amendment warrant requirement. *See Scott*, 270 F.3d at 45 (concluding that there was not an incentive for police misconduct because the issue of whether a de facto arrest occurred "was itself close and ... the police might have reasonably believed they had undertaken only a justified investigatory stop").

[¶ 45] Because the computer would have inevitably been discovered by lawful means, and the forensic examination of the computer occurred only after the police obtained a warrant that was based on probable cause, independent of the information that had been unlawfully obtained, the court did not err in denying the suppression motion.

E. The State's Failure to Complete its Forensic Examination of the Computer Within the Ten–Day Period Established by the Warrant and M.R.Crim. P. 41(d) Does Not Support the Application of the Exclusionary Rule

[¶ 46] The search warrant was issued on December 11, 2007, and contained the following directive: "This warrant shall be executed between the hours of 7:00 A.M. and 9:00 P.M. and shall be returned, together with a written inventory, within 10 days of the issuance hereof, to the Maine District Court in Farmington." Nadeau argues that the completion of the forensic search of his computer on July 21, 2008, long exceeded the ten-day period specified by the warrant and was therefore unconstitutional because the warrant had expired. The State contends that the failure to complete the forensic examination of the computer within the ten-day period does not justify the exclusion of that evidence, arguing that "the complexity of computer searches require[s] more flexibility with regard to the manner in which the evidence is obtained."

[¶ 47] Rule 41(d) of the Maine Rules of Criminal Procedure explicitly requires that warrants be executed and returned within ten days:

The warrant may be executed and returned only within 10 days after its date. Upon the expiration of the 10 days, the

warrant must be returned to the District Court designated in the warrant.

In *State v. Guthrie*, 90 Me. 448, 449, 38 A. 368, 368 (1897), we addressed the issue regarding the timing of the execution of a search warrant. In that case, we held that an unexplained three-day delay in executing a search warrant, once it had been issued, resulted in the warrant's expiration. *Id.* at 452, 38 A. at 369. We observed that search warrants are powerful investigative tools, the execution of which requires close judicial scrutiny and oversight: "[A search warrant] is a sharp and heavy police weapon to be used most carefully lest it wound the security or liberty of the citizen." *Id.* at 450, 38 A. at 369. To guard against the unlawful invasion of personal liberty, we concluded, "It is an integral principle in our system of law and government that ministerial officers assuming to execute a statute or process upon the property or person of a citizen shall execute it promptly, fully and precisely." *Id.* Failure to execute a search warrant promptly rendered the warrant "functus officio." [9] *Id.* at 450, 38 A. at 368.

▇▇▇▇ [¶ 48] The execution of a search warrant is the act of lawfully searching for and taking possession of property as authorized by the warrant. Unlike *Guthrie*, where the police did not search for or take possession of the item that was described in the search warrant until after the warrant had expired, 90 Me. at 449, 38 A. at 368, the officers in this case were already in possession of the computer at the time the warrant was issued. Thus, the warrant in the present case was effectively executed at the time it was issued, and there was no danger that a search for the computer conducted after the expiration of the ten-day period would result in a seizure based on stale probable cause. Further, once law enforcement officials are in lawful possession of an item, they need not obtain a search warrant each and every time they examine the item. *See United States v. Hernandez*, 183 F.Supp.2d 468, 480 (D.P.R.2002) ("The documents are seized within the time frame established in the warrant but examination of these documents may take a longer time, and extensions or additional warrants are not required."); *see also United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 65 (D.Conn.2002) (holding that a special agent's subsequent searches of computer data, which was obtained from an initial search and seizure conducted pursuant to a warrant, were "not analogous to returning to a crime scene to search for additional evidence and do not establish an impermissible, warrantless second or continuing search"). Thus, the State's forensic examination of the computer after the ten-day return period specified in the warrant was neither unconstitutional nor a violation of M.R.Crim. 41(d).[10]

**F. The Failure to Return the Warrant and File an Inventory With the Court Within the Ten–Day Period Established by M.R.Crim. P. 41(d) Does Not Support the Application of the Exclusionary Rule**

▇▇▇▇ [¶ 49] Nadeau also contends that the court erred by failing to provide an exclusionary remedy when Chief Blais failed to return the warrant and file an

---

**9.** Functus officio means "without further authority or legal competence because the duties and functions of the original commission have been fully accomplished." Black's Law Dictionary 682 (7th ed.1999).

**10.** We do not discuss the Superior Court's application of the good faith exception because the search warrant, which authorized the July forensic examination of the computer, never "expired."

inventory with the court. Rule 41(d) of the Maine Rules of Criminal Procedure outlines the process by which a written inventory must be completed and returned with the warrant within ten days:

> The return shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the person from whose possession or premises the property was taken, if the person is present, or in the presence of at least one credible person other than the applicant for the warrant. It shall be verified by the officer. Upon request the judge shall deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

[¶ 50] As we have previously held, "non-compliance with the ministerial demands of Rule 41(d) does not invalidate the search and seizure conducted pursuant to a warrant." *See, e.g., State v. Ellis*, 502 A.2d 1037, 1039 (Me.1985). Our jurisprudence clarifies that "ministerial demands" refer to acts such as completing an inventory in the person's presence and providing a receipt of an inventory. *See, e.g., State v. Appleton*, 297 A.2d 363, 371–72 (Me.1972). The application of the exclusionary rule is reserved for "persistent official disregard of the ministerial duties in Rule 41(d)." *Ellis*, 502 A.2d at 1039.

[¶ 51] Here, Chief Blais's failure to return the warrant accompanied by the written inventory amounts to a ministerial violation of Rule 41(d). Nadeau points to no actual prejudice flowing from this failure. The application of the exclusionary rule is not justified because the record supports the court's finding that Chief Blais's actions did not demonstrate "persistent official disregard" of the requirements in Rule 41(d).

## G. Nadeau's Statements to the Police Were Not Made in Violation of the Requirements of *Miranda v. Arizona* and Were Voluntary

[¶ 52] In addition to his Fourth Amendment arguments, Nadeau also argues that the court erred in concluding that he was not in custody at the time he made oral and written statements to the police and that the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, were not violated.

[¶ 53] "[A] *Miranda* warning is necessary only if a defendant is: (1) in custody; and (2) subject to interrogation." *State v. Higgins*, 2002 ME 77, ¶ 12, 796 A.2d 50, 54 (quotation marks omitted). Statements made by a person subjected to custodial interrogation who is not first given *Miranda* warnings are inadmissible against that person at trial. *State v. Bridges*, 2003 ME 103, ¶ 23, 829 A.2d 247, 254.

[¶ 54] A person, who is not subject to formal arrest, may be in custody if "a reasonable person standing in the shoes of [the defendant would] have felt he or she was not at liberty to terminate the interrogation and leave" or if there was "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *State v. Holloway*, 2000 ME 172, ¶ 14, 760 A.2d 223, 228 (quotation marks omitted). We consider several factors in their totality, *see id.* ¶ 19, 760 A.2d at 229, to determine whether a person was objectively in custody.[11]

---

11. We have established ten factors we examine in totality to determine whether a person was in custody:

(1) the locale where the defendant made the statements;
(2) the party who initiated the contact;

[¶ 55] The totality of the factors establishes that Nadeau was not in custody for purposes of triggering the *Miranda* requirements. First, the officers asked permission to enter Nadeau's room, and he consented. Second, the interview that followed was conducted in the familiar surroundings of Nadeau's own dorm room. *Compare Dion*, 2007 ME 87, ¶¶ 29–30, 928 A.2d at 752 (concluding that defendant was not in custody when he was questioned by police at his house), *with State v. Thibodeau*, 496 A.2d 635, 637, 639–40 (Me.1985) (concluding that the defendant was in custody when police placed him in the back of a two-door cruiser, drove him to an isolated side street, and questioned him for up to forty minutes). Third, the officers repeatedly told Nadeau that he was neither under arrest nor going to jail at that time, and offered him the option of continuing the interview in his dorm room or accompanying them to their office. Fourth, the interview was short in duration. Fifth, the officers' interview style was relatively low-key and non-confrontational. *See Dion*, 2007 ME 87, ¶ 29, 928 A.2d at 752. Therefore, because Nadeau was not in custody at the time he spoke with the officers, no *Miranda* violation occurred.

[¶ 56] Lastly, Nadeau argues that his statements were involuntarily made because "the officers exploited [his]

emotional state and fears when questioning him." To determine whether a confession is voluntary, a suppression judge considers the totality of the circumstances. *See id.* ¶ 32, 928 A.2d at 752. The State bears the burden of proving beyond a reasonable doubt that a confession is voluntary and, therefore, admissible in evidence. *See State v. Sawyer*, 2001 ME 88, ¶ 8, 772 A.2d 1173, 1175. "[T]o find a statement voluntary, it must first be established that it is the result of defendant's exercise of his own free will and rational intellect." *State v. Rees*, 2000 ME 55, ¶ 3, 748 A.2d 976, 977 (quotation marks omitted).

[¶ 57] Several facts, supported by record evidence, lead to the conclusion that Nadeau's statements to the police officers were voluntary. First, Nadeau was coherent and responsive, albeit very upset, throughout the interview. *Compare id.* ¶¶ 1–2, 748 A.2d at 977 (concluding that the defendant's statements were involuntary because he suffered from dementia), *with State v. Coombs*, 1998 ME 1, ¶¶ 5–6, 12, 704 A.2d 387, 389, 391 (holding that defendant's statements, which were made while she was periodically crying, intermittently handcuffed to a pole, and in an interrogation room for two to three hours, were voluntary). Second, Nadeau assured the officers that he was not going to harm himself.[12] Third, the officers neither made

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);
(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;
(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);
(7) whether the suspect was questioned in familiar surroundings;
(8) the number of law enforcement officers present;
(9) the degree of physical restraint placed upon the suspect; and
(10) the duration and character of the interrogation.
*State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226.

12. Nadeau suggests that the very question regarding potential self-harm indicates that he

threats to Nadeau nor used physical force to obtain statements from him. Although Officer Hart stated, "[T]he more cooperative you are, the better things are for you," this was not an implicit threat or a concrete promise of leniency. *See State v. Theriault,* 425 A.2d 986, 990 (Me.1981) (holding that defendant's statements to officers were voluntary even after the officers told the defendant that "it would be better to tell us [the truth]" and that "people would think more of him if he got it off his chest" (quotation marks omitted)). Fourth, there is no suggestion that Nadeau was suffering from a mental illness or was under the influence of any substances. Fifth, the entire interaction lasted less than fifteen minutes.

[¶ 58] Because the totality of circumstances establish beyond a reasonable doubt that Nadeau's oral and written statements were the product of his free will and intellect, the court did not err in concluding that his statements to the police were made voluntarily and should not be suppressed.

The entry is:

Judgment affirmed.

was not acting voluntarily. To the contrary, this good police practice is appropriately designed to be solicitous of the defendant's safety.